UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANITA L. PADGETT, | ) | Case No. 1:07 CV 1382 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge James S. Gallas |
| | ) | |

Anita L. Padgett filed this appeal seeking judicial reversal under 42 U.S.C. §405 (g) and §1383(c)(3) from the administrative denial of disability insurance benefits and supplemental security income. At issue is the ALJ's decision dated July 27, 2006, which stands as the final decision of the Commissioner. See 20 C.F.R. §404.1481, §416.981. The parties consented to the jurisdiction of the Magistrate Judge for all further proceedings including entry of judgment in accordance with 28 U.S.C. §636(c) and Rule 73 of the Federal Rules of Civil Procedure.

The Commissioner found that Padgett suffers from the severe impairments of schizophrenic disorder not otherwise specified and depressive disorder not otherwise specified (Tr. 16). The Commissioner discredited her complaints of fatigue, pain and limitations, and found Padgett could performs "**unlimited** lifting, carrying, pushing, pulling sitting and standing in an eight hour day." (See Tr. 17). Her Olympian physical abilities were tempered though by restriction to simple, routine work with no more than superficial interaction with others and without negotiation or confrontation

(Tr. 17). Based on the foregoing, the Commissioner has determined that Padgett can perform her past relevant work as an unskilled laundry worker. (Tr. 19).

Padgett challenges the Commissioner's decision contending :

1. The ALJ erred in finding that Padgett's mental residual functional capacity lacks support by substantial evidence.

2. The ALJ's erred in the evidentiary weight assigned to Padgett's treating sources.

*Standard of Review:*

The issues before this court must be resolved under the standard whether there is substantial evidence in the record to support the Commissioner's decision. Substantial evidence is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Casey v. Secretary of Health & Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Wyatt v. Secretary*, 974 F.2d 680, 683 (6th Cir. 1992); *Born v. Secretary*, 923 F.2d 1168, 1173 (6th Cir. 1990); and see *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (court may "not inquire whether the record could support a decision the other way").

*Sequential Evaluation and Meeting or Equaling the Listing of Impairments:*

The requisite analysis at the final stages of administrative review is known as the five-step sequential evaluation process. This evaluation begins with the question whether the claimant is engaged in substantial gainful activity and then at the second step whether there is a medically severe impairment. See §404.1520(a)(4)(I) and (ii) and §416.920(a)(4)(I) & (ii). At the third step

of a disability evaluation sequence the issue is whether the claimant has an impairment which meets or equals a listed impairment from the Listing of Impairments of Appendix 1. See 20 C.F.R. §404.1520(a)(iii) and (d); §416.920(a)(iii) and (d). If an impairment exists which meets the description from the listing or is its equivalent, the claimant is deemed disabled at that point without consideration of age, education or prior work experience. See *Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987); *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (Once a claimant has met this burden that ". . . his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without determination whether he can perform his prior work or other work.")."At the fourth step of the sequential approach described in 20 C.F.R. §404.1520, it is the claimant's burden to show that [he] is unable to perform [his] previous type of work." *Dykes ex rel. Brymer v. Barnhart*, 112 Fed. Appx. 463, 467, 2004 WL 2297874, at *3 (6th Cir. 2004)); *Studaway v. Sec'y of Health and Human Services*, 815 F.2d 1074, 1076 (6th Cir. 1987).Once the administrative decision-maker determines that an individual cannot perform past relevant work, then the burden of going forward shifts to the Commissioner at the fifth step to demonstrate the existence of types of employment compatible with the individual's disability. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Ellis v. Schweiker*, 739 F.2d 245 (6th Cir. 1984); *Cole v. Secretary*, 820 F.2d 768, 771 (6th Cir. 1987); *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990).

*Treating source opinion:*

Padgett had a history of crack cocaine and alcohol abuse, which ceased in January 2003. (Tr. 138, 221, 223). In March 2004 MetroHealth Medical Center treatment notes showed Michele Bender, MSN, APRN, BC, a psychiatric advance practice nurse, meeting with Padgett to discuss her psychiatric medications (Tr. 283-84). Padgett reported sleeping no longer than 2-3 hours a time (Tr. 283). Padgett was described as cooperative, but exhibiting agitated behavior (Tr. 283). She was oriented in all spheres with a rapid, pressured speech and tangential thought process (Tr. 283). Padgett had no suicidal thoughts and her mood and affect were depressed (Tr. 283). She had fair judgment and insight and memory was intact (Tr. 283). Nurse Bender revised Padgett's Risperdal prescription and started her on Seroquel for sleep (Tr. 284). Padgett's evaluation was generally unchanged the following month, May 2004, but she still reported difficulty sleeping (Tr. 280). The nurse adjusted Padgett's medications (Tr. 280). Padgett continued to see Nurse Bender on a monthly basis from July 2004 to September 2004 (Tr. 252-57, 262-66). Nurse Bender's mental status examinations generally remained consistent (Tr. 252-66), Padgett continued to hear "disparaging" voices and had difficulty concentrating. (Tr. 252, 254, 255 264). Also she reported some suicidal ideation with no intention in August 2004 (Tr. 256) and anger impulsivity (screaming, throwing things and swearing) in September 2004 (Tr. 252).

Nurse Bender revised her diagnostic impression in August 2004 to list schizoaffective disorder, bipolar type (Tr. 255). Padgett had been diagnosed previously as having major depression, recurrent (Tr. 257, 263), and schizoaffective disorder, chronic( Tr. 255). During each visit over the

three months, Nurse Bender adjusted Padgett's medications based on her subjective complaints (Tr. 252-66).

Padgett did not return to the medical center with psychological-based complaints until August 2005 (Tr. 334-36). Padgett's behavior was cooperative and she was oriented in all spheres (Tr. 334). She had normal speech and thought processes with some paranoia thought content and suicidal ideation with no clear intention (Tr. 334). Padgett had a depressed, anxious mood with constricted affect and reports of auditory hallucinations/voices (Tr. 335). Padgett had impaired attention/concentration and difficulty with memory (Tr. 335). Nurse Bender described Padgett as having good judgment and insight about her symptoms, but poor judgment about missing her appointments (Tr. 335). She also noted that Padgett was currently off her medications and that she argued about her inability to keep appointments (Tr. 335). Nurse Bender outlined a daily medication regime and refilled Padgett's medications (Tr. 335). On June 12, 2006 Nurse Bender opined that Padgett was disabled from a psychiatric standpoint due to schizoaffective disorder, bipolar type, current episode depressed and assigned a global assessment of functioning score of 41. (Tr. 415).

In December 2005, Aasia Syed, M.D., of the MetroHealth Medical Center, saw Padgett, who reported increased agitation, financial problems, paranoia, and having suicidal thoughts without ideation (Tr. 382). When asked if she needed to be admitted Padgett responded that her "SI" suicidal ideation was occasional and not currently present (Tr. 383). Dr. Syed described Padgett as

being cooperative, but tearful, and oriented to time, person, and place (Tr. 383). Padgett had normal speech, logical and organized thought process, and paranoid thoughts of not being able to trust people (Tr. 383). Her mood was depressed, anxious, and irritable, but she had fair judgment and insight (Tr. 383). Her memory was normal and she had sustained concentration and attention (Tr. 383). Dr. Syed's impressions were increased depression and psychosis and schizophrenia, paranoid type (Tr. 383). Based on examination, he increased Padgett's current medications and added additional psychotropic and sleep medications (Tr. 383). Later that month, Dr. Syed's clinical findings were generally unchanged, and Padgett reported that the increased Welbutrin made her heart race, so she discontinued taking it (Tr. 389). The physician increased her other medications accordingly (Tr. 389).

In February 2006, Dr. Syed completed a HUD occupancy form which stated that Padgett was disabled as defined by the Social Security Act, but not as defined by the Developmental Disability Assistance Act (Tr. 338-39). Dr Syed concluded that Padgett's mental impairment did not substantially impede her ability to live independently (Tr. 338-39).

Uncontradicted opinion from a treating physician is entitled to complete deference. See *Shelman v. Heckler*, 821 F.2d 316, 320 (6th Cir. 1987); *Jones v. Secretary of Health & Human Serv.*, 964 F.2d 526 (1992). The Commissioner's determination, though, utilizes the consultative psychological opinion from Dr. Felker to contradict the opinions from treating sources. ( Tr. 18, 233-35). Dr Felker interviewed Padgett in May 2004 (Tr. 233). Padgett denied hallucinations and Dr.

7

Felker's diagnosis was depressive disorder not otherwise specified (Tr. 235) He assigned a global assessment of functioning score of 55, and indicated mild to moderate restrictions in abilities to concentrate, attend to tasks, follow instruction, and carry out routine tasks. (*Id.*). Dr. Felker believed there was moderate restriction in relating to others and tolerating ths stresses of employment.

The Commissioner has adopted a decision which rejected Nurse Bender's opinion because the determination of disability is reserved for the Commissioner, Nurse Bender is not an acceptable medical source, the opinion is contrary to the observations of Dr. Syed who noted fair judgment with normal attention, concentration and memory, and this opinion is contrary to Padgett's own testimony that she is able to live alone without assistance to perform activities such as shopping and cleaning (Tr. 19). Dr. Syed's opinion of disability was rejected apparently because in December 2005 Padgett exhibited logical and organized thought processes, fair judgment and full range of effect, and in February 2006, Padgett had sustained attention and concentration and her memory was within normal limits (Tr. 18).

As *Wilson v. Commissioner* instructs, the ALJ must give the opinion from the treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Id.*, 378 F.3d 541, 544 (6th Cir. 2004) quoting 20 C.F.R. §404.1527(d)(2) and §416.927(d)(2). However, reversal is required when in rejecting a treating physician's opinion the ALJ failed to give "good reasons" for not giving weight to that opinion. See *Wilson v. Commissioner*

*of Soc. Sec.* 378 F.3d 541, 544 (6th Cir. 2004). This requirement for articulated "good reason" has been long recognized since at least SSR Rulings 96-2p and 96-5p, which require the ALJ to articulate specific legitimate reasons supported by substantial evidence in the record that are sufficiently specific to make clear to subsequent review as the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Supportability is fairly obvious to determine if it is based on the laboratory findings and medical signs. Consistency is simply consistency "with the record as a whole." Supportability of the medical opinion of disability has long been a key factor in determining how much weight to give the opinion. The ALJ is not bound by a conclusory opinion which is unsupported by detailed objective criteria, or when there is substantial medical evidence to the contrary. *Cutlip v. Secretary*, 25 F.3d 284, 286 (6th Cir. 1994); *Cohen v. Secretary*, 964 F.2d 524, 528 (6th Cir. 1992); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). This has been incorporated into the regulatory scheme under §404.1527(d)(2) and its SSI counterpart §416.927(d)(2), which require that the treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques." This includes reporting : (1) treatment provided; (2) extent of examination; and (3) testing (20 C.F.R. §404.1527(d)(2)(ii) and §416.927(d)(2)(ii)). The ALJ *must* apply the regulatory factors of this section when explaining why the treating source was not accorded controlling weight. *Bowen v. Commissioner of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007), citing *Wilson*, 378 F.3d at 544. The ALJ also must consider the medical opinions "together with the rest of the relevant evidence." See 20 C.F.R. §416.927(b).

9

The determination was correct that opinions of disability are reserved for the Commissioner. See *Cutlip v. Sect'y. of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994). However, that does not eliminate the "good reason" requirement. First, there was error in failing to acknowledge Nurse Bender's opinion as one from a "medical source." 20 C.F.R.§404.1513(a) and §416.913(a) do not list advanced practice nurses[1] as "acceptable medical sources," subsection "d" of these regulations does at least acknowledge "nurse practitioners" among the nonexclusive list of "other sources" from which evidence of the severity of impairment may be obtained. The Tenth Circuit in a well-reasoned decision has found administrative error in failing to discuss the weight given to clinical nurse specialist opinion based extensively on Social Security Ruling (SSR) 06-3p. See *Frantz v. Astrue,* 509 F.3d 1299, 126 Soc. Sec. Rep. Serv. 91 (10th Cir. 2007):

> The Ruling specifies that the factors for weighing the opinions of acceptable medical sources set out in 20 C.F.R. § 404.1527(d) and § 416.927(d) apply equally to "all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other [non-medical] sources.' " Id. at *4. Thus, depending on the particular

---

[1] Technically, Nurse Bender is a clinical nurse specialist (CNS) as described under Ohio Rev. Code §4723.43 (D). As such she may, " provide and manage the care of individuals and groups with complex health problems and provide health care services that promote, improve, and manage health care within the nurse's nursing specialty, [and] may, in collaboration with one or more physicians or podiatrists prescribe drugs and therapeutic devices in accordance with section 4723.481 of the Revised Code." A similar provision under Ohio Rev. Code §4723.43(C) governs certified nurse practitioners.

"CNS programs were the first nursing specialty to require graduate level preparation, and thus served as a model for excellence in advanced practice nursing education." Stacey B. Rose et al., *Role Preservation of the Clinical Nurse Specialist and the Nurse Practitioner*, The Internet Journal of Advanced Nursing Practice 3 (1996), http:// www. ispub. com /ostia/index.php? xmlFilePath=journals/ijanp/vol5n2/role. xml. Both CNSs and NPs [Nurse Practitioners] are considered advanced practice nurses, and both must be able to "assess, diagnos[e], prescribe therapy, and maintain accountability." *Id.* at 4. Additionally, they must be skilled at effective communication, critical thinking, decision-making, critical and accurate assessment, and the ability to evaluate client responses and create appropriate interventions. *Id.*

*Frantz v. Astrue,* 509 F.3d 1299, 1301n.2  (10th Cir. 2007)

10

> facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

*Id*. at *5.

The Ruling instructs the adjudicator to

> explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Id.* at *6.

*Frantz*, 509 F.3d at 1302.[2]

The ALJ should have discussed what weight he gave Nurse Bender's opinion but nonetheless the ALJ did state reasons for rejection- that it was contrary to the observations of Dr. Syed. (Tr. 19). Accordingly, the same reasoning was applied to both opinions of disability.

The ALJ explains that Dr. Syed reported normal findings for logical and organized thought processes, sustained attention and concentration and memory within normal limits (Tr. 18). The ALJ's explanation was an extremely selective distortion of Dr. Syed's reports. In December 2005, the doctor did report logical and organized thought processes, however, Padgett's thoughts were

---

[2] Granted SSR 06-3p was promulgated on August 9, 2006, about 2-weeks subsequent to the ALJ's decision. However, the ruling relies heavily upon the points contained in the regulations and does not depart in any novel way from existing law or procedure extant at the time of the ALJ's decision.

paranoid, expressed fear of leaving her house and that her daughter was "tired of me living in her house" and contained suicidal ideation. (Tr. 383). Reportedly there was increased agitation, crying, and thoughts of suicide (throwing herself off a bridge) (Tr. 382). Padgett stated that the suicidal thoughts were her own and not the "voices." The doctor's response was to increase medication. (Tr. 383).

In February 2006, Dr. Syed reported Padgett was staying with a friend, crying "a lot" and was unfocused. (Tr. 400). The doctor again noted logical and organized thought processes, but their content was paranoid, and Padgett was experiencing mild auditory hallucinations, and difficulty in attention and concentration. (Tr. 401). Paranoid schizophrenia was diagnosed and changes made to the treatment plan including decrease in Resperdal and start of Abilify and Effexor (*Id.*). Also the ALJ misread the report and stated that schizophrenia was "occasional" (Tr. 18), when Dr. Syed's report was discussing occasional suicidal ideation, "SI" (Tr. 383) and subsequent lack of "SI" and "HI."(Tr.400).  Dr. Syed's reports did not demonstrate that Padgett had the capability to perform basic work activities any more than these reports established that her schizophrenia was only intermittent. The ALJ's selective review did not provide "good reason" to reject Dr. Syed's opinion and the ALJ gave inadequate consideration of Nurse Bender's reports and opinion as an additional medical source.

*Remand for award of benefits:*

12

In this circuit, though, the Commissioner's decision may be reversed and benefits awarded only when the Commissioner's decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking.  *Newkirk v. Shalala*, 25 F.3d 316 (6th Cir. 1994); *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985); and see *Lashley v. Secretary*, 708 F.2d 1049 (6th Cir. 1983).

The only evidence standing in the way of an award of benefits is Dr. Felker's mental impairment evaluation (Tr. 233-35) and the mental residual functional capacity assessment produced as a result (Tr. 236-251). The state agency reviewing psychologist noted only Dr. Felker's report in his May 2004 assessment and his summary sheds some light on the situation. The state agency physician explained that psychological issues were mentioned in the application but never ruled out (Tr. 251).  On the reconsideration level of review stress and depression were alleged and Dr. Felker's consultative examination was ordered. Consequently, none of Nurse Bender's reports on Padgett's schizophrenic condition  were considered and Dr. Syed's opinion followed the state agency review by many months. Nonetheless, the ALJ clung to Dr. Felker's report and the mental residual functional capacity assessment which included consideration of only depression. These two reports were obviously incomplete and the ALJ's reliance on them constituted clear error given the overwhelming evidence of disability in this matter.

However, there is one more hurdle due to the Contract with America Advancement Act which amended 42 U.S.C. §423(d)(2)(C) to read, "[a]n individual shall not be considered to be

13

disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled, " and regulations enacted to carry out its purpose See 20 C.F.R. §§404.1535 and 416.935. Padgett claims disability onset on November 22, 2002, while she was drug addicted. The Commissioner states that the history of alcohol abuse and cocaine addiction did not end until January 2003. As a result the calculation of benefits cannot commence until February 2003.

### *CONCLUSION*

For the foregoing reasons based on the arguments presented, the record in this matter and applicable law, the undersigned finds that the Commissioner's decision denying disability insurance benefits and supplemental security income benefits was not supported by substantial evidence and is reversed and remanded for the award and calculation of benefits commencing with February 2003.

s/James S. Gallas<br>United States Magistrate Judge

Dated: September 30, 2008